**Opinion issued February 26, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NOS. 01-10-00531-CR, 01-10-00532-CR, 01-10-00534-CR**

———————————

**JOSEPH JOHN FLORES, II, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 228th Judicial District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1114129, 1114130, 1222277**

**MEMORANDUM OPINION**

A jury found appellant, Joseph John Flores, II, guilty of two offenses of aggravated assault on a public servant[1] and the offense of possession of more than four and less than 200 grams of cocaine.[2] The trial court assessed his punishment at confinement for thirty years for the aggravated-assault offenses and confinement for fifteen years for the possession-of-cocaine offense, and it ordered the sentences to run concurrently.[3] In his first issue, appellant contends that the trial court erred in prohibiting him from questioning the venire panel about potential bias concerning police officer testimony. In his second through sixteenth issues, appellant contends that the State suppressed evidence that would have rendered his prior felony conviction inadmissible and the trial court erred in denying his subsequent motion for a mistrial and motion to suppress the felony conviction, admitting the prior felony conviction, admitting testimony that a grand jury "no-billed" the complainant public servants, admitting inadmissible hearsay statements for impeachment, admitting improper opinion testimony, admitting testimony of

---

[1] *See* TEX. PENAL CODE ANN. § 22.02(a),(b)(2)(B) (Vernon 2011); appellate cause numbers 01-10-00531-CR, 01-10-00532-CR; trial court cause numbers 1114129, 1114130.

[2] *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.115(a),(d) (Vernon 2010); appellate cause number 01-10-00534-CR; trial court cause number 1222277.

[3] Appellant also pleaded guilty to the offense of possession with intent to deliver more than 400 grams of hydrocodone. He challenges that conviction in a separate appeal under appellate cause number 01-10-00533-CR.

2

extraneous misconduct and extraneous offenses, and excluding relevant testimony. In his seventeenth and eighteenth issues, appellant contends that the trial court erred in permitting improper jury argument by the State. In his nineteenth through twenty-fourth issues, appellant contends that the trial court erred in improperly instructing the jury, refusing to submit to the jury his requested instructions, and denying his motion to set aside his indictment for possession of cocaine based on "prosecutorial vindictiveness," and the trial court's cumulative errors denied him due process of law and a fair trial.

We affirm.

## Background

Houston Police Department ("HPD") Officer F. Rodriguez testified that on April 23, 2007, he, as a case agent in HPD's narcotics division, received information from a confidential informant that appellant sold narcotics from his apartment. To confirm the informant's report, Rodriguez, along with a "targeted narcotics enforcement team," began conducting surveillance on appellant's apartment. He first sent the informant to the apartment to make a "buy," and the informant returned with codeine obtained from within the apartment. The police officers continued their surveillance and noticed "sporadic traffic" in and out of appellant's apartment. Based on the information he received, Rodriguez drafted a search warrant for the apartment.

3

After a judge signed the warrant, Officer Rodriguez, on April 25, 2007 at 6:00 a.m., convened a team of himself, Officer F. Scoggins, Lieutenant D. Gafford, and four other HPD officers to address his "raid plan" for executing the warrant. The team wore the "standard uniform" for a "hard entry," which consisted of black pants, "some kind of black T-shirt that says police," a "heavy protective ballistic vest" with "police" printed on the front and back, and ballistic Kevlar helmets. Rodriguez's surveillance indicated that appellant would usually sell narcotics until 4:00 a.m., so he expected appellant to be asleep when the police officers executed the warrant.

Upon the officers' arrival at the apartment complex, Officer Wood obtained a key to appellant's apartment from the apartment manager. As the officers approached appellant's front door, Officer Rodriguez noted that a light was on in the kitchen. Wood knocked, announced "police," and attempted to open the door with the key, but the door was restrained by a deadbolt lock. Rodriguez, who heard "movement" and "footsteps running" from inside the apartment, motioned for HPD Officer Bradley to knock down the door with a battering ram. After three tries, Bradley breached the door and stepped aside to allow Scoggins, who was designated as the "point man" and carried a shotgun, to enter the apartment first, followed by Rodriguez.

4

Upon their entry, all of the officers shouted "police, search warrant, police, get on the ground."  Rodriguez then saw appellant move away from the front door with a shotgun "that he was trying to manipulate and trying to work."  Officer Scoggins shouted at appellant to "drop the gun," which was pointed at Scoggins and Rodriguez, but appellant "ejected a round from the chamber and tried to load another one to try to make it fire."  Scoggins then shot appellant, who retreated behind a wall for "a second" before he "stepped back out" and attempted to "jack another round into the chamber."  Rodriguez then shot him.  Appellant dropped the shotgun and fell to the ground.  Rodriguez noticed a woman, later identified as Jessica Davies, on a couch beside the other officers, and he ordered Davies to show her hands.  She "totally complied and just laid there and didn't move."  He then called for emergency assistance for appellant, and, because the officers had shot a civilian, he called HPD's Internal Affairs Office to the scene.

After paramedics transported appellant to a hospital, the officers proceeded to search the apartment.  They discovered several "little bags" of marijuana throughout the apartment, "pure" codeine, and several bags of cocaine that Officer Rodriguez opined to have come "off of a brick of cocaine or a kilo of cocaine."  The officers also found a pistol, several baby bottles, which Rodriguez opined were used for distributing codeine, a ledger tracking various narcotics sales, and a safe containing "a whole list of different drugs," over 1,000 pre-packaged

5

hydrocodone pills, 593 pre-packaged Xanax pills, and "hydroponic" marijuana. Rodriguez explained that the amount and packaging of the narcotics were consistent with an intent to deliver. And he noted that although he and Officer Scoggins were called before a grand jury regarding appellant's shooting, they were "cleared of wrongdoing."

On cross-examination, Officer Rodriguez conceded that in the stance that officers are trained to use when aiming their firearms at a target, the word "police" on the front of their ballistics vests is blocked by their arm. He also conceded that a burglar could impersonate a police officer in an attempt into gain entry to a residence. Rodriguez noted that after shooting appellant, he removed two unfired cartridges from appellant's shotgun. And Rodriguez explained that the officers found forty-two grams of cocaine underneath the mattress of appellant's bed and thirteen grams of cocaine behind the headboard.

Officer Scoggins testified that the officers wore raid gear instead of police uniforms because the warrant was considered "high-risk" and the officers needed greater protection. The raid gear was distinctively marked with the word "police" on the front and back. He explained that after very loudly announcing, "police, search warrant, get on the ground," he entered the apartment and, after one or two steps, saw appellant moving away from the front door and pointing a shotgun at him. Scoggins "fully expected to get shot" because appellant was

6

fumbling with his firearm and "looked like he was trying to discharge it." Accordingly, Scoggins fired his shotgun "as fast as [he] could take the safety off and shoot it." Appellant then hid behind a wall, but quickly emerged and pointed his shotgun toward Officer Rodriguez. Scoggins then pulled the trigger on his shotgun a second time, but it misfired. As Scoggins attempted to fix the malfunction, Rodriguez shot appellant, who fell to the ground and dropped his shotgun. On cross-examination, Scoggins admitted that before HPD Internal Affairs officers arrived to investigate the shooting, he and the other officers informally discussed the incident. He further admitted that other officers were present when he was first questioned by the Internal Affairs investigators.

James Miller, a chemist in HPD Crime Lab's "controlled substances section," testified that he received and tested the narcotics seized from the search of appellant's apartment. The combined weight of the cocaine found in appellant's apartment was 44.3 grams. Miller explained that the weights of the narcotics, when tested in the crime lab, often differ from the weights obtained by police officers at crime scenes because the officers occasionally include the packaging when weighing narcotics. He also noted that the crime lab is more particular about the accuracy of its scales. On cross-examination, Miller explained that he received two different samples of cocaine, the larger of which weighed 41.1 grams and the smaller of which weighed 3.2 grams.

7

Jennifer Davies first testified outside of the presence of the jury for the trial court to determine the voluntariness of a written statement that she had given to officers after the shooting. She explained that after the officers had shot appellant, they placed her in handcuffs and escorted her to the back of a patrol car, where she remained for "[a]bout six and a half hours." At some point, an officer asked her whether she had "heard anything" before the officers entered the apartment. Before she could respond, the officer told her, "You need to think about what you're saying because you can go down just like that guy." Another officer then transported her to a police station, asked her questions, and "provid[ed her] the answer" to those questions, which were not "consistent with what [she] saw and . . . heard." Davies believed that the officers were threatening to charge her with possession of the narcotics found in appellant's apartment if she did not answer their questions the way that they suggested. The trial court denied appellant's motion to suppress Davies' statement, finding that it was made voluntarily and was not a product of coercion.

Davies then testified in the presence of the jury that, as of April 25, 2007, she had been dating appellant for "[m]aybe four months." And she continued to date appellant through the time of the trial. Davies explained that she had arrived at appellant's house at around 4:00 a.m., before the execution of the search warrant, to watch television and "just hang out." Appellant had told her that he

8

"possesse[d] some drugs," such as codeine and marijuana, but she did not know where any narcotics were stored and did not know of any cocaine in the apartment. Davies fell asleep on the couch while the television was still on, and, when she awoke, she saw "two or three people in a dark uniform" and heard "a lot of hollering." She then turned and saw appellant laying down and not moving. Davies did not hear anyone yell "police," and she did not see appellant attempt to shoot at Officers Rodriguez and Scoggins. A police officer then handcuffed Davies and escorted her to a patrol car in the apartment complex parking lot, where she sat for approximately six hours. Eventually, the officers escorted another woman, later identified as Jeannette Russell, to the patrol car to wait with Davies.

After Davies admitted that she had previously been convicted of making a false statement to a peace officer, she was shown State's Exhibit number 156, the written statement she had given to a police officer at a police station. In her sworn statement, Davies had said that she had "heard a pound at the door and a loud male voice say police." However, she testified that she felt "threatened" into signing the statement and she did not actually hear a pound on the door or a voice saying, "police." Davies also admitted that much of the information given in her statement, such as the nature of her relationship with appellant, was true. The trial court then admitted the written statement into evidence with the limiting

9

instruction that it be considered only for the purpose of "passing upon the credibility of this witness."

Jeanette Russell testified that on the morning of April 25, 2007, she was sitting on the patio at her apartment, located in the same complex as appellant's apartment. She was "starting to doze off" when she was awakened by loud noises. Russell then saw several police officers approach appellant's apartment, and they were "wearing uniforms and vests that had Houston police on them in gold." As the officers reached the door to appellant's apartment, Russell heard them loudly "holler[] police" followed by three "bangs." Some time later, she saw an officer escort Davies out of appellant's apartment.

Later that day, an HPD detective came to Russell's apartment, informed her that the officers had seen her on her patio, and asked her to come to a police station to give a statement regarding what she had seen. The detective escorted her to a patrol car, where Davies was sitting in the back seat, and he told them that they could not talk to each other about the shooting. He then drove Russell and Davies to a police station, where Russell gave a statement to an officer, who "heard [her] statement and typed till it was finished." After giving her statement, Russell waited in the police station with Davies, who told her that her boyfriend had just been shot by a police officer. Davies told her that she knew they were police officers when they entered the apartment. She stated that appellant had "made bad

10

choices" and had tried to shoot the officers. However, Davies never mentioned being coerced or intimidated into giving a false statement. On cross-examination, Russell explained she had a "clear view" of the front and back of the police officers' vests as they approached appellant's apartment.

HPD Detective J. Selvera testified that he was assigned after the shooting to "canvass the area" around appellant's apartment for potential witnesses. After speaking with several of appellant's neighbors, Selvera interviewed appellant at a hospital. After Selvera began to read to appellant his legal rights, but before he could finish, he had to "terminate the interview." However, after Selvera had tried "several times" to end the interview, appellant "continue[d] to re-initiate" the conversation. Selvera then recorded appellant's statements, which were admitted into evidence.

Karen Fanaff, who had lived in the same apartment complex as appellant, testified that on the morning of April 25, 2007, she heard a "loud bang" followed by a second sound she immediately recognized as a gunshot. Startled, she stepped onto her balcony and saw "six or seven gentlemen who appeared . . . to be police officers." Some of the officers were wearing "standard uniforms," while others were dressed like a "SWAT team" but still appeared to be "official" police officers. Although Fanaff did not hear any voices or anyone yelling "police" from inside her apartment, she was not surprised because of the noise in her own

11

apartment. After Fanaff testified, several other neighbors testified that they had not heard anyone yell "police."

Appellant testified that on April 25, 2007, he knowingly possessed, with the intent to sell, hydrocodone, Xanax, and marijuana. However, he explained that he was not aware that cocaine had been hidden in his bedroom. And he later learned that the cocaine belonged to his friends, Danny Garcia and Aaron Trevino. Appellant explained that Garcia and Trevino had previously asked if they could leave cocaine in his apartment, but they did not ask for permission on that day. Appellant also noted that several burglaries had been committed in his apartment complex, and he had seen a news report about "people pretending to be police officers when they broke into residences." And a few weeks before trial, he had visited a "police supply store" where he was allowed to purchase shirts and hats that had "police" written on them.

In the morning on April 25, 2007, appellant had smoked marijuana and had taken codeine before Davies had come to his apartment. They fell asleep shortly after her arrival and had left the television and the kitchen light on. Appellant was then awakened by a loud noise "like a hurricane" hitting his front door. Because he believed that "burglars" or "robbers" were trying to get inside his apartment, appellant grabbed his firearm when a man in black clothes entered the apartment carrying a firearm. Appellant then "cocked the shotgun" and "cycled the action,"

12

with the safety still engaged, in an attempt to frighten the intruder. Appellant was then shot, took cover behind a wall, and then emerged from behind the wall to "cycle the action at them again to try to scare them away." However, he was "instantaneously" shot again. During the entire incident, appellant did not hear anyone yell "police" or see badges, patches, or a distinctive police uniform. Only after he was shot, did appellant realize that the men who had entered his apartment were police officers.

On cross-examination, appellant admitted that he had previously "disregarded the lawful commands of a police officer knowing they were a police officer" and been convicted of the felony offense of possession of a controlled substance and the misdemeanor offenses of theft and burglary of a motor vehicle. He explained that Garcia and Trevino had come to his apartment the night before the shooting and suggested that they must have left the cocaine in his room that night. Later, when Detective Selvera attempted to interview him at the hospital, appellant told him, "I need to talk to my lawyer because I know I didn't try to kill no one." However, after invoking his right to counsel, appellant told Selvera that he "thought [he] was getting robbed" and he "was cocking [his gun] just to try to scare them."

**Voir Dire**

In his first issue, appellant argues that the trial court erred in prohibiting him from asking the venire panel about any "biases in determining the credibility of multiple police officers versus one citizen" because it prevented him from determining which members of the panel were challengeable for cause.

Questions during voir dire are proper if they seek to discover a venire member's views on an issue applicable to the case. *Smith v. State*, 703 S.W.2d 641, 643 (Tex. Crim. App. 1985). Voir dire examination permits the parties to assess the desirability of prospective jurors and to select a "competent, fair, impartial, and unprejudiced jury[.]" *Staley v. State*, 887 S.W.2d 885, 896–97 (Tex. Crim. App. 1994). Because a trial court has broad discretion over the process of selecting a jury, an appellate court should not disturb a trial court's ruling on the propriety of a particular question during voir dire absent an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

An attorney may not "attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts." *Lydia v. State*, 109 S.W.3d 495, 497 (Tex. Crim. App. 2003). "Questions that commit prospective jurors to a position, using a hypothetical or otherwise, are improper and serve no purpose other than to commit the jury to a specific set of facts before the presentation of any evidence at trial." *Id.*

The test for determining when a voir dire question calls for an improper commitment has two steps: "(1) Is the question a commitment question, and (2) Does the question *include only those facts* that lead to a *valid challenge for cause?*" *Id.* (emphasis added). If the answer to the first question is "yes" and the answer to the second question is "no," then the question asked is an improper commitment question. *Id.* at 497–98. "Commitment questions 'commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact.'" *Id.* (quoting *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001)).

> Here, appellant's counsel asked a venire member,

> Well, how hard would it be for five or six police officers who worked together to get together and make sure that they're telling the same story, even if it's not the truth?

The venire member answered, "You'd have to assume that they would have colluded together to do that." Appellant's counsel then asked,

> And are you not able to—are you not able to envision a scenario where officers, maybe with the help of prosecutors—

The State objected to the question as "improper," and the trial court sustained the objection, stating, "That's a commitment question." Appellant then asked the same venire member,

> [W]ould you . . . automatically believe the testimony of multiple officers against one citizen just because there happened to be multiple officers?

15

The State objected to the question as an "improper commitment," and the trial court sustained the objection.

Appellant concedes that he asked a commitment question, but asserts that it was a proper commitment question that was designed to elicit whether any venire members were "biased in favor of police officers." The State asserts that, rather than eliciting potential bias from the venire panel, the question "attempted to bias or prejudice the panel by indoctrinating them on appellant's theory" that the officers had colluded in providing their testimony.

A venire member may be challenged for cause if the member "has a bias or prejudice in favor of or against the defendant." TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9) (Vernon 2006). A venire member may also be challenged for cause if the juror "cannot impartially judge the credibility of a witness." *Ladd v. State*, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999). Here, appellant asked if the venire member would "automatically" believe the testimony of several police officers over the testimony of one civilian, seeking to discover whether the member could impartially evaluate the testimony of a witness whose testimony conflicted with that of several police officers. A venire member who would "automatically" believe the testimony of several police officers could not impartially judge the credibility of the witnesses. Thus, the proffered question did not seek to "create

16

bias" by instructing the juror "what trial counsel wanted him to believe" as the State asserts.

The State also asserts that the question constituted an improper "global fishing expedition," relying on *Barajas*, 93 S.W.3d at 41–42. In *Barajas*, the Texas Court of Criminal Appeals held that a trial court acted within its discretion by prohibiting the defendant from asking "whether the venire members could be impartial in an indecency case involving a victim who was eight to ten years old or, in the alternative, a victim who was nine years old." *Id.* at 38. The court explained that asking a venire member whether he could be "fair and impartial" under a given state of facts is a "license to go fishing," and it emphasized the "need for counsel to ask specific questions." *Id.* at 41. Here, however, appellant's question was sufficiently specific so as not to constitute a "global fishing expedition" as described in *Barajas*. Appellant's question was a proper commitment question, and we hold that the trial court abused its discretion in denying him the opportunity to proffer it to the venire panel. *See Vann v. State*, 216 S.W.3d 881, 885–86 (Tex. App.—Fort Worth 2007, no pet.) (holding that trial court abused its discretion in prohibiting defense counsel from asking whether venire panel "would automatically disbelieve a witness with a prior felony conviction"); *Rivera v. State*, 82 S.W.3d 64, 66–67 (Tex. App.—San Antonio 2002, pet. ref'd) (holding that trial court abused its discretion in prohibiting

17

defense counsel from asking whether venire panel would automatically disbelieve defendant's testimony).

A trial court's refusal to permit defense counsel to ask a proper question during voir dire constitutes constitutional error. *Jones v. State*, 223 S.W.3d 379, 383–84 (Tex. Crim. App. 2007). When reviewing the harm arising from constitutional error, a court of appeals must reverse the judgment of conviction unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). We focus on the integrity of the process leading to the conviction, not on the propriety of the outcome of the trial. *See Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We must calculate, as nearly as possible, the probable impact of the error on the jury in light of the evidence adduced at trial. *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt." *Id.* The critical inquiry is whether there is "a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook*, 29 S.W.3d at 119.

When analyzing the harm from the prohibition of a proper question to a venire panel, we review the entire record, and to the extent applicable, use the following factors as context for our consideration of the error's effect on the jury's

18

deliberations: (1) any testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error. *Rich v. State*, 160 S.W.3d 575, 577–78 (Tex. Crim. App. 2005).

Here, the evidence introduced at trial included the testimony of Officers Rodriguez and Scoggins and Lieutenant Gafford. Although it also included Russell's testimony and Davies' written statement, the credibility of the police officers was initially important to the State's case. And the State, in its closing argument, did emphasize that multiple police officers and Russell had testified that the officers had clearly announced their presence before entering appellant's apartment.

However, in regard to the voir dire, appellant's counsel was allowed to ask the venire panel members about whether they believed that "police officers are more credible than other citizens." He was also allowed to ask whether the panel members might think that "a police officer would never exaggerate or distort facts" and, "What might cause a police officer to lie under oath?" Thus, appellant was given ample opportunity to probe the venire panel members as to any bias or

19

prejudice they might have had in favor of the testimony of police officers. Viewing the prohibited question in the context of the entire voir dire, we conclude beyond a reasonable doubt that there is not a reasonable likelihood that the trial court's error contributed to appellant's conviction. *See Rodriguez-Flores v. State*, 351 S.W.3d 612, 626–27 (Tex. App.—Austin 2011, pet. ref'd) (holding that trial court's denial of defendant's question regarding jurors' ability to apply duress defense was harmless where defendant was still able to engage in extensive discussion with and questioning regarding "the duress defense"). Accordingly, we hold that any error in the trial court's prohibiting of appellant's proper commitment question was harmless.

We overrule appellant's first issue.

## Exculpatory Evidence

In his second and third issues, appellant argues that the trial court erred in "denying a mistrial after the State disclosed" that it had "suppressed evidence that would have rendered appellant's prior felony conviction inadmissible" because his testimony should not have been impeached with evidence of the conviction. In his fourth issue, appellant argues that the trial court erred in "denying [his] motion to suppress his prior felony conviction because it is invalid."

The State has an affirmative duty to disclose evidence favorable and material to a defendant's guilt or punishment under the due process clause of the Fourteenth

Amendment. *See Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S. Ct. 1194, 1196– 97 (1963). A defendant is entitled to a new trial if (1) the State suppresses evidence, (2) the evidence is favorable to the accused, and (3) the evidence creates a probability sufficient to undermine the confidence in the outcome of the proceeding, i.e., the evidence is material. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). In regard to the second prong, "[f]avorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence." *Id.* at 408. "Exculpatory evidence may justify, excuse, or clear the defendant from fault, while impeachment evidence is that which disputes or contradicts other evidence." *Id.* "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the State's failure to disclose the favorable evidence." *Id.* at 406.

At trial, the State introduced into evidence appellant's 2001 conviction, entered after a guilty plea, for felony possession of more than four grams and less than 400 grams of "MDMA," also known as "ecstasy." Appellant moved to suppress evidence of the conviction, arguing that it was invalid because "the offense report from that case reflects that the quantity of the substance was weighed by the police without packaging as 2.6 grams," rendering him actually innocent of the second-degree felony offense of possession of more than four, but

21

less than 400 grams of MDMA. Appellant also argued that his guilty plea was involuntary because "if [his] counsel had advised him that the offense report reflected that the weight of the substance was 2.6 grams, [he] would not have pled guilty." The trial court denied his motion to suppress.

Appellant's conviction of the felony offense of possession of MDMA was also alleged in an enhancement paragraph in the instant cases. However, before the punishment phase of trial, the State noted that it did some research to try to determine the actual weight of the narcotics because, in the offense report, "the drugs allegedly weighed 2.6 grams." The State obtained a copy of the official lab report, which did not list a weight for the narcotics. Also, Derek Sanders, a chemist at the Pasadena Police Department crime lab, informed the State that "the weight of 3.7 grams of Ecstasy was found in a worksheet that belonged to the chemist who's no longer employed there." He explained that he could not "swear under oath that that is the accurate weight" and did not know "why that weight did not make it into the official document." The State ultimately abandoned the enhancement paragraph but submitted the lab report into evidence "if [appellant] want[s] relief further down the road." Appellant then moved for a mistrial, arguing that, pursuant to *Brady*, the State was required to produce any "information to support [his] assertion that if [he] possessed Ecstasy, it was less than four grams," but it failed to produce anything until the punishment phase of trial.

22

The trial court conducted an evidentiary hearing on appellant's motion for mistrial in which the prosecutor, Maritza Antu, testified that she did not recognize the discrepancy until appellant filed a motion to quash the enhancement paragraph before trial. She noted that the offense report included a weight of MDMA at 5.1 grams. However, Antu stated that she did not call the crime lab to clarify the weight because appellant had pleaded guilty to having possessed more than four grams of MDMA and she "couldn't go based on what an offense report said versus" the judgment and mandate. She explained that because the trial court had asked whether she had possession of the lab report, she then felt compelled to call the crime lab to procure one. At that time, Sanders sent her the official lab report that did not list a weight of the MDMA. Antu also noted that when Sanders told her the weight recorded on the worksheet, he explained that the weight was not official and "he could not testify under oath that that's what the weight actually was." The trial court denied appellant's motion for a mistrial.

Appellant asserts that the State "suppressed evidence from the crime lab that would have shown that [his] prior felony conviction was invalid because he was actually innocent of possessing more than four grams of MDMA." The evidence introduced in the mistrial hearing consisted of the lab report, which does not note the weight of the MDMA, and the lab "worksheet," which indicates that that the MDMA weighed about 3.7 grams. However, Sanders testified that the worksheet

23

indicated that the MDMA was tested on April 3 and 4 of 2001, and appellant pleaded guilty to the offense approximately two weeks earlier, on March 19, 2001. Sanders also explained that, without personal knowledge, he could not alter the lab report to reflect a weight of 3.7 grams. He noted that the only way he could testify to the actual weight of the MDMA was to retest it himself. And, even assuming that appellant's assertion that the lab worksheet accurately indicates the weight of the MDMA as 3.7 grams, we note that possession of MDMA weighing more than one gram but less than four grams is still a third-degree felony offense, as opposed to a second-degree felony offense. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.103(a)(1) (Vernon Supp. 2012); *id.* § 481.116(c) (Vernon 2010). Thus, even assuming some uncertainty regarding appellant's conviction for possession of MDMA, we cannot conclude that the evidence presented at the mistrial hearing demonstrates a probability sufficient to undermine the confidence in the outcome of the proceeding. *See Harm*, 183 S.W.3d at 406 (noting requirement that defendant must be prejudiced by State's failure to disclose evidence).

Furthermore, we note that the evidence adduced at the hearing would not render appellant's conviction for possession of MDMA "invalid" or "void." A prior conviction which is void cannot be used for the purpose of enhancing punishment or impeachment. *Wood v. State*, 478 S.W.2d 513, 515 (Tex. Crim.

24

App. 1972). However, a judgment is void only in very rare situations, usually due to the trial court's lack of jurisdiction. *Nix v. State*, 65 S.W.3d 664, 668 (Tex. Crim. App. 2001). The very nearly exclusive list of situations in which the judgment of conviction is void are those in which: (1) the document purporting to be a charging instrument does not satisfy the constitutional requisites of a charging instrument, and, thus, the trial court has no jurisdiction over the defendant; (2) the trial court lacks subject-matter jurisdiction over the offense charged, such as when a misdemeanor involving official misconduct is tried in a county court at law; (3) the record reflects that there is no evidence to support the conviction; or (4) an indigent defendant is required to face criminal trial proceedings without appointed counsel, when such has not been waived. *Id.* Moreover, for a judgment to be void, the record must leave no question about the existence of the fundamental defect. *Id.* "If the record is incomplete, and the missing portion could conceivably show that the defect does not in fact exist, then the judgment is not void, even though the available portions of the record tend to support the existence of the defect." *Id.* at 668–69.

From this record, we cannot conclude that there is no evidence to support the conviction or agree with appellant that the evidence proved that he was actually innocent of possessing more than four grams of MDMA. Thus, even assuming that the State suppressed any evidence in this case, we cannot conclude that the

25

evidence would have rendered appellant's prior felony conviction inadmissible on the grounds that it was invalid, void, or inadmissible for impeachment. Accordingly, we hold that any alleged suppression of evidence regarding appellant's prior conviction for possession of MDMA was immaterial and the trial court did not abuse its discretion in denying appellant's motion for mistrial or motion to suppress the prior conviction.

We overrule appellant's second, third, and fourth issues.[4]

## Admission and Suppression of Evidence

In his fifth, sixth, ninth, tenth, eleventh, twelfth, and thirteenth issues, appellant argues that the trial court erred in admitting certain evidence because it improperly "undermined the credibility of appellant and Davies and bolstered the credibility of the police officers and Russell." In his seventh and eighth issues, appellant argues that the trial court erred in admitting the testimony of Davies and her written statement because the State called her "for the primary purpose of impeaching her" and her written statement was made involuntarily. In his fourteenth, fifteenth, and sixteenth issues, appellant argues that the trial court erred

---

[4] Appellant filed a motion requesting that this Court order the district clerk to unseal certain documents for his review in support of his *Brady* arguments. On August 16, 2011, we denied the motion but indicated we would conduct our own *in camera* review of the documents as part of this appeal. After conducting our own review, we conclude that they contain no *Brady* information. *See Reece v. State*, 878 S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1994, no pet.) (conducting its own review of sealed documents in appeal where defendant argued that sealed documents contained *Brady* material).

in excluding certain evidence because it would have properly "enhanced appellant's credibility and diminished the police officers' credibility."

### Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). A trial court does not abuse its discretion if its ruling "was at least within the zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

### Extraneous Matters Concerning Appellant

In his fifth issue, appellant argues that the trial court erred in admitting into evidence his prior felony conviction for possession of MDMA because it had "little impeachment value" and was "too prejudicial for admission."

Evidence of a witness's prior conviction shall be admitted for purposes of impeachment if the crime was a felony or a crime of moral turpitude and the court determines that the probative value of the evidence outweighs its prejudicial effect. TEX. R. EVID. 609(a). In *Theus v. State*, the Texas Court of Criminal Appeals set out a non-exclusive list of factors courts should use to weigh the probative value of a conviction against its prejudicial effect. 845 S.W.2d 874, 880 (Tex. Crim. App. 1992). The factors include (1) the impeachment value of the prior crime, (2) the temporal proximity of the prior crime relative to the charged offense and the

witness's subsequent history, (3) the similarity between the prior crime and the charged offense, (4) the importance of the witness's testimony, and (5) the importance of the witness's credibility. *Id.* The proponent seeking to introduce evidence pursuant to rule 609 has the burden of demonstrating that the probative value of a conviction outweighs its prejudicial effect. *Id.*

In regard to the impeachment value of prior offenses, we note that narcotics-related crimes tend to have a lower impeachment value because they do not involve deception, moral turpitude, or violence. *See Denman v. State*, 193 S.W.3d 129, 136 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (rejecting State's argument to hold delivery of cocaine to be crime of moral turpitude). Thus, appellant's prior conviction for possession of MDMA does not have high impeachment value, and the first *Theus* factor weighs against admissibility.

In regard to the temporal proximity of prior offenses relative to a charged offense, the law favors admission of prior offenses if they occurred recently and the witness has demonstrated a pattern of running afoul of the law. *See Theus*, 845 S.W.2d at 881. Here, appellant was convicted of the felony offense of possession of MDMA and the misdemeanor offenses of theft in 2001 and burglary of a motor vehicle in 2003. Appellant's prior felony conviction for possession of MDMA occurred nine years before trial, and although his misdemeanor convictions did indicate a propensity for "running afoul of the law," the last of those convictions

28

occurred seven years before trial. Even if his criminal history indicated some pattern of breaking the law, his crimes were committed far enough in the past to mitigate their probative value. *See Woodall v. State*, 77 S.W.3d 388, 395–96 (Tex. App.—Fort Worth 2002, pet. ref'd) (stating, although convictions showed propensity for criminal behavior, convictions also had to be recent for third factor to weigh in favor of admissibility). Thus, the second *Theus* factor weighs slightly against admissibility.

In regard to the similarity between the prior offense and the instant offense, we note that the elements of the offense of possession of MDMA are substantially similar the elements of the offense of possession of cocaine. The similarity between his prior felony offense and the offense of possession of cocaine militates against admissibility. *See Miller v. State*, 196 S.W.3d 256, 268 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding similarity between two offenses of possession of controlled substance militated against admission of prior conviction); *Fautner v. State*, No. 05-01-01297-CR, 2003 WL 21783349, at *3 (Tex. App.—Dallas Aug. 4, 2003, no pet.) (not designated for publication) (stating that prior convictions for possession of cocaine were similar to charged offense of possession delivery of cocaine). And the admission of his conviction for possession of MDMA was likely prejudicial to his defense in regard to the offense of possession of cocaine.

*See Rodriguez v. State*, 129 S.W.3d 551, 560 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

In regard to the substance of appellant's testimony and the importance of his credibility, appellant testified at trial that he was unaware that the men who entered his apartment were actually police officers, he believed them to be burglars, he did not intend to shoot them but only to frighten them, he never heard the officers announce their presence as police officers, and he did not possess the cocaine found in his bedroom. He was the only witness who could testify as to his knowledge of the presence of cocaine in his apartment and his belief that the police officers were burglars. Thus, his credibility was critical. Therefore, we conclude that the fourth and fifth *Theus* factors favor admission. *See Davis v. State*, 259 S.W.3d 778, 784 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). However, because the first three *Theus* factors weigh against admission, we hold that the trial court erred in admitting into evidence his prior felony conviction.

A violation of evidentiary rules that results in the erroneous admission of evidence constitutes non-constitutional error. *See* TEX. R. APP. P. 44.2(b). Non-constitutional error "that does not affect substantial rights must be disregarded." *Id.* A substantial right is affected when an error has a substantial and injurious effect or influence in determining a jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Therefore, a criminal conviction should not be

overturned for non-constitutional error if an appellate court, upon examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

In his testimony, appellant admitted to knowingly possessing, at the time the officers executed the search warrant, "a lot" of hydrocodone, Xanax, and codeine with the intent to deliver the narcotics. He also admitted to knowingly possessing steroids for personal use and MDMA with the intent to deliver it. Appellant's ledger, which tracked various narcotics transactions was admitted into evidence, and he further admitted to being a narcotics user and dealer since he was 17 or 18 years old. Thus, the prejudicial effect arising from the admission of appellant's prior conviction of felony possession of MDMA was mitigated by his own testimony. We cannot conclude that the admission of his prior conviction had a substantial or injurious effect or influence in determining the jury's verdict. Accordingly, we hold that the trial court's error in the admission of appellant's prior conviction for possession of MDMA was harmless.

We overrule appellant's fifth issue.

In his eleventh issue, appellant complains that the trial court allowed the State to ask him whether he had previously "knowingly disregarded the lawful commands" of police officers "knowing that they were police officers." Appellant argues that because the testimony was not probative of any material fact in dispute, it was more prejudicial than probative. *See* TEX. R. EVID. 401, 403. He asserts that the State "wanted to introduce this testimony as character conformity evidence, which is demonstrated by the manner in which it emphasized the testimony in summation." *See* TEX. R. EVID. 404(b).

Evidence that has any tendency to make the existence of "any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant evidence. TEX. R. EVID. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX. R. EVID. 403. The presumption is that relevant evidence is more probative than prejudicial. *Montgomery*, 810 S.W.2d at 389.

Evidence of other crimes or bad acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. TEX. R. EVID. 404(b); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). However, this evidence may be admissible for other purposes, such as proof of motive,

32

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). "Rebuttal of a defensive theory such as mistake or accident is also one of the permissible purposes for which relevant evidence may be admitted under rule 404(b)." *Moses v. State*, 105 S.W.3d at 622, 626 (Tex. Crim. App. 2003).

Here, appellant testified that he pointed his shotgun at the police officers and "cycled" it twice because he believed that they were burglars and, had he known that they were police officers, he would not have done so. The State presented conflicting evidence from Officers Scoggins and Rodriguez that prior to their entry into appellant's apartment, all of the police officers in the raid team shouted "police." As noted above, appellant's credibility was a critical issue in the case, and the State was entitled to rebut appellant's assertion that had he known they were police officers, he would not have pointed his firearm at them.

Although appellant asserts that the State offered the complained-of evidence to prove that he knew that the complainants were police officers on this occasion, the evidence, as the trial court explained, was relevant to show "even if he had known that they were police officers, that he would not comply." After the State asked appellant about this, the trial court instructed the jury,

> You may consider this answer of the witness for the limited purpose of rebutting an inference that the defendant would comply with an officer's command had he known they were officers, if that does help you. And you can consider it for no other purpose.

33

Thus, the trial court sought to mitigate any potential prejudicial effect of the evidence by limiting it to the scenario where appellant disregarded commands "knowing they were police officers." Accordingly, we hold that the trial court did not err in admitting evidence that appellant had previously, knowingly disregarded the lawful commands of a police officer.

We overrule appellant's eleventh issue.

In his twelfth issue, appellant argues that the trial court erred in "admitting testimony of an unadjudicated extraneous offense suggesting that [he] was involved in stealing codeine from pharmacies" because the testimony was irrelevant. *See* TEX. R. EVID. 401, 404(b). Specifically, appellant complains of the following exchange during Officer Rodriguez's testimony,

| [STATE]: | In the drug world, how do dealers get their hands on codeine? |
|---|---|
| [RODRIQUEZ]: | A lot of places get burglarized—a lot of small pharmacies or warehouses get burglarized and it comes out on the black market that way. |

Appellant objected to Rodriguez's statement, and although the trial court overruled his objection, it instructed the jury that "there is no evidence supporting that the defendant in any manner broke into any kind of pharmacy."

The line of questioning indicates that the State tried to establish generally how codeine may be acquired for illegal distribution. Officer Rodriguez's

34

testimony did not establish that appellant was a party to burglaries. And the trial court's limiting instruction clarified for the jury that Rodriguez's statement did not establish that appellant was a party to a burglary of a pharmacy. We hold that the trial court did not err in admitting Rodriquez's general explanation.

We overrule appellant's twelfth issue.

In his thirteenth issue, appellant complains that the trial court erred in admitting into evidence "the portion of the audio recording of [his] oral statements that included his receipt" of legal warnings, "post-arrest silence, and invocation of the right to counsel."

Prior to trial, appellant filed a motion in limine seeking to, "in the event that the State wants to elicit any statements made by [appellant] during that interview at the hospital or if they want to actually play the recorded statement in its entirety, . . . exclude or suppress any invocations of constitutional rights made by [appellant]." The trial court denied the motion in limine.

At trial, Detective Selvera testified that when he spoke with appellant at a hospital, he first read to him his legal rights. Appellant objected to "the State eliciting the fact that he was Mirandized and invoked any of his federal constitutional rights." The State responded that it was "laying the foundation to make [appellant's recorded] statement admissible." The trial court overruled the objection and stated that as "long as it meets the statutory guidelines for

35

admissibility, then I'm going to allow it." Selvera then testified that he read appellant his "legal warnings," at some point he had to "terminate the interview," appellant "initiate[d] a conversation" afterwards, appellant continued to ask questions after termination of the interview, and appellant then voluntarily offered a statement.

In regard to appellant's recorded statement, we note that he only filed a motion in limine, did not object to its admission into evidence at trial, and did not object to it being played to the jury during the State's closing argument. The granting or denial of a motion in limine is only a preliminary ruling, and the making of the motion does not preserve error in the admission of evidence; a separate trial objection must be made at the time the evidence is offered for admission. *See Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003); TEX. R. APP. P. 33.1(a). Accordingly, we hold that appellant has not preserved his complaint regarding the admissibility of his recorded statement into evidence.

In support of his argument that Detective Selvera's testimony was also inadmissible, appellant relies on *Kalisz v. State*, 32 S.W.3d 718, 722–23 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). In *Kalisz*, the Fourteenth Court of Appeals held that a trial court erred in introducing a portion of a defendant's statement that contained "the questions regarding his right to counsel and everything thereafter," although "all the *Miranda* questions" and the defendant's

36

answers to them preceding the invocation were admissible. *Id.* at 722–23. The court relied in part on *Hardie v. State*, wherein the Texas Court of Criminal Appeals held that a defendant's invocation of the federal right to counsel during a custodial interrogation is inadmissible as evidence of guilt. *Kalisz*, 32 S.W.3d at 723 (citing *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991)); *see also Stepp v. State*, No. 14-05-00635-CR, 2007 WL 608977, at *6 (Tex. App.— Houston [14th Dist.] Mar. 1, 2007, pet. ref'd) (mem. op.) (not designated for publication).

Here, Detective Selvera testified only that after he began reading appellant his legal rights, he was forced to "terminate the interview." Selvera did not testify that appellant invoked his right to silence or his federal right to counsel. Rather, appellant, in his direct testimony, stated that, "I told him that I wanted to talk to my lawyer 'cause I know I didn't try to kill no officer." Furthermore, we note that any statement by Selvera that he had to "terminate the interview" was not offered as substantive evidence of guilt. Rather, his testimony merely explained the circumstances surrounding appellant's statement offered *after* the termination of the interview, Selvera's recording of it, and its admissibility. Accordingly, we hold that the trial court did not err in admitting Selvera's testimony that he read appellant his legal rights, had to terminate the interview, and then received a voluntary statement from appellant after he had initially terminated the interview.

37

We overrule appellant's thirteenth issue.

***Extraneous Matters Concerning the Police Officers***

In his sixth issue, appellant argues that the trial court erred in "admitting testimony that a grand jury no-billed the complainants and that police investigators concluded that they were justified in shooting appellant" because the evidence was irrelevant and more prejudicial than probative. *See* TEX. R. EVID. 401, 403.

During his testimony, Lieutenant Gafford, a supervisor of Officers Rodriguez and Scoggins and a member of the raid team, explained, over appellant's running objection, that homicide investigators and the Internal Affairs Division had determined that Rodriguez and Scoggins were both "justified" in shooting appellant. Gafford further noted that a grand jury "no-billed" Scoggins and Rodriguez and determined that their shooting of appellant was justified. In regard to appellant's objection, the State argued that appellant had opened the door to this testimony because, during his opening statement and cross-examination of Gafford, appellant was "basically insinuating the officers covered up their tracks."

> During his opening statement, appellant's counsel asserted,
>
> They take appellant away to the hospital, not sure if he's going to live or die. And then the wheels go into motion of how to make this look clean for the police.
>
> Internal Affairs officers show up. Homicide detectives show up. . . . And you will hear how efforts were made to make sure that all the stories were consistent.

38

During his cross-examination of Gafford, appellant's counsel asked if Gafford was required to notify HPD Internal Affairs or the Harris County District Attorney's office to investigate any allegations that Davies' statement was coerced, if Davies was threatened with potential prosecution for narcotics offenses, or if it was suggested that she could be charged with possession of narcotics. Counsel also asked Gafford if there is "always going to be an investigation" when a police officer shoots a civilian and whether the police officer could be liable for administrative or civil penalties.

Here, appellant, in his opening statement, expressly referenced the investigations by HPD Internal Affairs and Homicide detectives, asserting that "efforts were made to make sure that all the stories were consistent." Thus, Lieutenant Gafford's testimony was relevant to rebut this defensive theory and explain the standard procedures regarding HPD Internal Affairs and Homicide investigations upon the shooting of a civilian by a police officer. And because appellant specifically asserted that, in this case, the investigations were part of collusion to ensure that all of the officers' stories were "consistent," the State was entitled to introduce evidence that a grand jury had "no-billed" Officers Scoggins and Rodriguez. Furthermore, we cannot conclude that this evidence was "more prejudicial than probative." Accordingly, we hold that the trial court did not err in

admitting testimony that a grand jury "no-billed" Officers Scoggins and Rodriguez regarding the shooting of appellant and HPD's investigation of the shooting.

We overrule appellant's sixth issue.

In his tenth issue, appellant argues that the trial court erred in "admitting testimony that [Officer] Scoggins had not previously fired a weapon in the line of duty" because it was irrelevant.

Officer Scoggins testified that when he shot appellant, he did not know exactly whether appellant was "pulling the trigger, trying to pull the pump or whatever" but there was "some type of . . . backward movement with the weapon." So, Scoggins "assumed [appellant] was trying to shoot" him. Scoggins then explained that he had "never fired [his] weapon on duty" before. Appellant objected, and the trial court overruled the objection, stating, "You can testify as—if it goes to explain your actions on this particular event." When the State asked Scoggins why it was "important" that he had never discharged his firearm on duty before, Scoggins replied,

> I knew I was fixing to get shot and there's no question. There wasn't a whole lot of shoot, don't shoot. It was shoot as fast as you can. And it's the first time I'd never experienced that, shoot now, shoot, shoot, shoot, you know, shoot as fast as you can. So, I had never—over the years many people with weapons and you don't—I have never had that experience. So, it was a—it was a response to an immediate threat that I had to shoot.

A person commits the offense of aggravated assault if the person "intentionally or knowingly threatens another with imminent bodily injury." TEX. PENAL CODE ANN. § 22.01(a)(2) (Vernon 2011). Thus, from the context of the questioning, it is apparent that Officer Scoggins's testimony was intended to explain to the jury that the threat from appellant was imminent, and the fact that he had never discharged his firearm before tended to prove this. Accordingly, we hold that the trial court did not err in admitting evidence that Scoggins had not discharged his firearm "on duty" before shooting appellant.

We overrule appellant's tenth issue.

In his fourteenth issue, appellant complains that the trial court erred in "excluding testimony that [Officer] Scoggins was previously suspended by HPD because he tried to cover-up an officer-involved shooting and lied about it to investigators."

As noted above, evidence of other crimes is not admissible to prove the character of a person in order to show that he acted in conformity therewith. TEX. R. EVID. 404(b). Furthermore, "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than the conviction of a crime as provided in rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." TEX. R. EVID. 608(b). Thus, prior unrelated acts of untruthfulness are generally inadmissible

41

under rule 608(b). *See, e.g., Hammer v. State*, 296 S.W.3d 555, 563 (Tex. Crim. App. 2009) ("A witness's general character for truthfulness or credibility may not be attacked by cross-examining him (or offering extrinsic evidence) concerning specific prior instances of untruthfulness.").

On cross-examination, Officer Scoggins testified that he did not tell Officer Rodriguez "to clean and reload his weapon before another law enforcement officer arrived" at the scene and he would never tell an officer to clean and reload his weapon before Internal Affairs investigators arrived after a shooting. Appellant then asked if Scoggins had ever "lied about what happened during a police shooting to protect another officer." The trial court then sustained the State's objection to the question.

During appellant's bill of exception, made outside the presence of the jury, Scoggins admitted that he had previously been suspended by HPD for five days for "failing to comply with the rules regarding interfering with the investigation of cases and truthfulness." He had been found "to have conspired to cover up the discharge of firearms by contacting another officer and instructing him to clean and reload his weapon before submitting it to [I]nternal [A]ffairs personnel." Scoggins explained that during an "off-duty incident" his partner was "intoxicated" and "accused of firing a weapon." Scoggins admitted that he took his partner

home, but he denied telling him to clean or reload his weapon, although another officer had accused Scoggins of doing so.

In support of his argument that the exclusion of this testimony denied him his "constitutional right to present a defense," appellant relies heavily on *Cloud v. State*, 567 S.W.2d 801 (Tex. Crim. App. 1978). In *Cloud*, the defendant attempted to impeach a police officer who allegedly had filed a false report about another officer in a vice undercover operation. *Id.* at 802. The Texas Court of Criminal Appeals explained that "[g]reat latitude should be allowed to show a witness' bias or motive to falsify his testimony," but it concluded that the trial court acted within its discretion in excluding the false report because the officer had filed a complaint against the defendant "prior to the events which led to the officer's suspension." *Id.* at 802–03. Thus, the court ultimately held that the officer's prior misconduct was properly excluded because it did not tend to show bias or a motive to falsify testimony in the defendant's case. *Id.* at 803; *see also McMillon v. State*, 294 S.W.3d 198, 203 (Tex. App.—Texarkana 2009, no pet.) (holding that trial court did not err in excluding evidence that police officer had written "phantom" traffic tickets because there was no evidence it would establish bias in that particular case).

Likewise, here, there is no indication that Officer Scoggins' prior suspension for "failing to comply with the rules regarding interfering with the investigation of

43

cases and truthfulness" had any tendency to demonstrate a bias against appellant or a motive to falsify his testimony in this case. At the time of trial, Scoggins was no longer under suspension, and there was no indication that he was on probation for his suspension. And any such specific impeachment testimony is barred by rules 404(b) and 608(b). We hold that the trial court did not err in excluding the evidence that HPD had previously suspended Scoggins. *See, e.g., Hammer*, 296 S.W.3d at 568–69 (holding testimony that sexual assault victim had made several previous accusations was admissible only so far as it was "relevant to [victim's] animus toward [the defendant] and her desire to get out of his house"); *Cloud*, 567 S.W.2d at 803.

We overrule appellant's fourteenth issue.

In his fifteenth issue, appellant argues that the trial court erred in "excluding testimony that a member of the police raid team is married to a senior prosecutor who supervised the trial court prosecutors" because it "barred appellant from impeaching witnesses and presenting a defense."

During his cross-examination of both Lieutenant Gafford and Officer Scoggins, appellant asked if Officer Bradley, a member of the raid team, was "married to a prosecutor." And the trial court sustained the State's objections to the questions. In his bill of exception, appellant stated that Bradley's wife "was the division chief who supervised the prosecutors assigned to the 228th District

Court both in April of 2007 at the time of the incident" and at the time of trial. The State, however, clarified that at the time of trial, neither of the prosecutors on the case were supervised by Bradley's wife.

The proponent of evidence regarding bias must show that the evidence is relevant. *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004). The proponent does this by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party. *Id.* Here, Officer Bradley did not testify, and he was in no way implicated in the shooting of appellant. In fact, appellant testified that Bradley had "saved his life" by administering first aid after he was shot. There were no allegations or demonstrations of misconduct by Officer Bradley at trial. Accordingly, we hold that the trial court did not err in excluding evidence that Officer Bradley was married to a senior prosecutor at the time of the incident and at the time of trial.

We overrule appellant's fifteenth issue.

### Hearsay Statements

In his sixteenth issue, appellant argues that the trial court erred in "excluding testimony that would have impeached, and corrected the false impression left by, Tamara Drouillard's alleged hearsay statements" because the State "created the

false impression through [witnesses Jack] Scott that Drouillard heard what happened and told the police that she heard men's voices."

Scott testified that on the morning that the search warrant was executed, he was in the apartment of his girlfriend, Tamara Drouillard, in the same complex as appellant's apartment and did not hear any "banging," "yelling," or "gunshots" that morning. On cross-examination, Scott explained that he was a "deep sleeper" and Drouillard had awakened him, "said there's something going on," and heard what "sounded like a washing machine being thrown down a flight of stairs." However, Scott explained that he could not recall whether Drouillard had mentioned that she had heard "yelling." Later, during Detective Selvera's testimony, appellant, on cross-examination, attempted to ask him questions about his interviews of Scott and Drouillard. Specifically, appellant asserted that "the State elicited from Mr. Scott what Ms. Drouillard said during the conversation, but did not elicit the fact that she never heard anyone yell police." The trial court sustained the State's objection to the question as calling for hearsay. Appellant made a bill of exception, offering Drouillard's recorded statement that she was "dead asleep," heard "a big crash and yelling," and did not hear anyone say "police."

A statement is hearsay if it is "other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). Generally, hearsay is not admissible

46

except as provided by statute or the rules of evidence. TEX. R. EVID. 802. Appellant argues that the testimony was nevertheless admissible under the rule of "optional completeness," which provides that "[w]hen a part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, . . . any other act, declaration, writing, or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence." *See* TEX. R. EVID. 107.

Although appellant asserts that the State "created the false impression that Drouillard heard what happened and told the police that she heard men's voices," Scott only testified that he could not recall whether anyone had yelled "police" and Drouillard had heard men's voices, which was substantiated by her recorded statement. Thus, we cannot agree with appellant that Scott's testimony created a false impression or was "substantially incorrect." Accordingly, we hold that the trial court did not err in excluding Detective Selvera's testimony about his interviews of Scott and Drouillard.

We overrule appellant's fifteenth issue.

### Davies's Testimony

In his seventh issue, appellant argues that the trial court erred in "permitting the State to call Jessica Davies and impeach her with otherwise inadmissible

47

hearsay statements" because "it called her for the primary purpose of impeaching her."

The credibility of any witness may be challenged by any party, including the witness's proponent. TEX. R. EVID. 607. The right to impeach one's own witness, however, does not permit a party to call a witness, whom that party knows will testify contrary to a prior statement, as a mere subterfuge to provide a basis for otherwise inadmissible evidence. *Brasher v. State*, 139 S.W.3d 369, 371–72 (Tex. App.—San Antonio 2004, pet. ref'd). To the extent the State calls a witness whom it anticipates will testify contrary to a prior statement, there is a risk that the testimony is offered as a "mere subterfuge." *See Hughes v. State*, 4 S.W.3d 1, 5 n.9 (Tex. Crim. App. 1999). To determine whether testimony is being offered for such a purpose, a court should consider whether the impeachment evidence is more prejudicial than probative, the State was surprised by the witness's recantation, and the witness provided any favorable testimony. *See id.* at 5.

When the State first announced its intention to call Davies, it stated that it was going to "impeach her testimony with Ms. Russell, who was also in the car with her." After Davies testified that she did not hear anyone yell, "police" when the officers executed the search warrant, the State attempted to impeach her with her prior written statement. Appellant objected that "the State is not permitted to call a witness for the sole purpose of impeaching that witness." The State asserted

48

that Davies' testimony was also relevant to other substantive issues, such as "the location that [appellant] actually lived in this unit," appellant's status a dealer in narcotics, and his possession of firearms in his apartment. The trial court then allowed the State to impeach Davies's testimony with her prior sworn statement about whether she had heard anyone yell, "police." Later, the State further impeached Davies' statement with Russell's testimony that Davies had told her that she knew that the complainants were police officers when they entered the apartment and appellant had tried to shoot the officers.

In *Hughes*, the State called the defendant's wife to testify about statements that she had made to Child Protective Services ("CPS") that the defendant had sexually abused her child, and she denied making the statements to two CPS caseworkers. *Id.* at 3. The State then called both caseworkers to impeach the wife's testimony, and they testified that the defendant's wife had told them that he had admitted to sexually abusing her child. *Id.* The court rejected the notion that the State's awareness "that its witness will testify unfavorably" automatically denies it the opportunity to impeach a witness; it held that "the State's knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403." *Id.* at 5. The court explained that rule 403 would bar the admission of evidence where "the State profits from the witness' testimony only if the jury misuses the evidence by

considering it for its truth." *Id.* The court concluded that the trial court should not have allowed the State to impeach the defendant's wife because the State knew that the defendant's wife would testify unfavorably, and the State "elicited no favorable testimony from [the wife]." *Id.* at 7.

Here, at the hearing on appellant's motion for new trial, the State explained that it wanted to contrast Davies's testimony that she complied with the officers' orders to stay still and raise her hands in the air with appellant's failure to cooperate with the officers' commands. The State also explained that it wanted to call Davies to the stand to rebut appellant's theory that the State "was covering up for crooked cops" by arguing that it had "tried to keep [Davies's recantation]" from the jury. It asserted that it needed Davies's testimony "to testify about what happened from the second those police officers knocked on the door," explaining that the jury "may not want to hear the words from a police officer." The State asserted that its strategy for calling Davies was "to testify to the links to the drugs, to the guns in the house, that he was an occupant, that he was actually there that day. . . . [And], if she was going to lie about certain things or—obviously we had to have impeachment material available."

Thus, although the State knew that Davies would testify unfavorably regarding whether she had heard the officers announce their presence as "police" or recognized the complainants as police officers, Davies, as the only civilian

witness to the events other than appellant, also provided substantial evidence regarding appellant's links to narcotics, firearms, and the sequence of events once the complainants entered the apartment. And the substance of the impeachment evidence, i.e., that Davies had, in fact, heard someone yell, "police," was also found in the testimony of Russell and the officers. *See Kelly v. State*, 60 S.W.3d 299, 302 (Tex. App.—Dallas 2001, no pet.) (noting that because several other witnesses testified to the substance of hearsay testimony used to impeach witness, there existed less risk testimony "would be misused by the jury"). Furthermore, we note that the trial court, both during the impeachment of Davies with her written statement and Russell's testimony regarding her conversation with Davies, instructed the jury that the evidence was to be used only for impeachment purposes. Accordingly, we hold that the trial court did not err in allowing the State to call Davies as a witness and impeach her testimony that she did not hear anyone yell, "police." *Polston v. State*, No. 03-10-00379-CR, 2011 WL 3435389, at *5 (Tex. App.—Austin Aug. 5, 2011, pet. ref'd) (holding that because State was able to elicit some favorable testimony, "although limited," and witness was one of two complainants in the case, the trial court did not abuse its discretion in admitting the impeachment testimony).

We overrule appellant's seventh issue.

51

In his eighth issue, appellant argues that the trial court erred in denying his motion to suppress Davies's written statement because it was given involuntarily and "coerced by threats from the police that she could be prosecuted for felony drug possession" if she did not testify as they indicated. *See* TEX. CODE CRIM. PROC. ANN. arts. 38.21, 38.22 (Vernon 2005).

Appellant objected to the admission of Davies's statement, citing articles 38.21 and 38.22. A "statement of *an accused* may be used in evidence *against him* if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." *Id.* art. 38.21 (emphasis added). And no "written statement made *by an accused* as a result of interrogation is admissible *as evidence against him*" unless it is shown that the accused was read and voluntarily waived his legal rights. *Id.* art. 38.22 §2(a) (emphasis added).

An accused does not have standing to complain about evidence that is illegally obtained unless it was done so in violation of his own rights. *See Chavez v. State*, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000). For example, in the context of searches and seizures, a defendant does not have standing to complain of the illegal search of another's residence. *See Janecka v. State*, 739 S.W.2d 813, 830 (Tex. Crim. App. 1987). Similarly, a defendant does not have standing to attack the constitutionality of a co-defendant's statement. *See Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) (holding defendant had no standing to raise

52

constitutional or statutory challenge as to legality of co-defendant's statement); *Pugh v. State*, No. 07-05-0187-CR, 2007 WL 686639, at *3 (Tex. App.—Amarillo March 22, 2007, pet. ref'd). Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress Davies's statement.

We overrule appellant's eighth issue.

### *Russell's Testimony*

In his ninth issue, appellant complains that the trial court erred in "admitting improper opinion testimony" from Russell that "Davies was credible when she allegedly said that she knew the men were police and that appellant tried to shoot them."

Russell testified that Davies told her that she knew the complainants were police officers and appellant tried to shoot them. When asked what Davies specifically told her, Russell replied,

> She said yes. And I—and I said he tried to shoot them. And she said yes. And then I thought, that's a very nice honest girl. You know— that's a sweet honest girl. And I thought that was nice.

The State then asked if the answer surprised her, and Russell replied, "And she was just so honest. So sweet and honest, you know." Appellant then objected, asserting that Russell's testimony amounted to an "improper opinion" that "the other person was honest when they made a certain statement." The trial court overruled the objection.

53

As a prerequisite to presenting a complaint for appellate review, the record must show that a timely objection was made to the trial court. TEX. R. APP. P. 33.1(a). An objection should be made as soon as the ground for objection becomes apparent. *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997). If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived. *Id.*

Here, appellant did not object to Russell's statement that Davies appeared "honest" during their prior conversation until she had expressed the belief twice. Accordingly, we hold that appellant has waived any error regarding this testimony.

We overrule appellant's ninth issue.

### Improper Jury Argument

In his seventeenth and eighteenth issues, appellant argues that the trial court erred in permitting the State to argue during closing arguments its "opinion that Jeanette Russell was the most credible witness she had ever called" and "that appellant did not want Jessica Davies to testify" because the State communicated to the jury that it should treat Russell's testimony as more credible than any other witnesses and injected matters not in the record.

Proper jury argument is generally limited to (1) summation of the evidence presented at trial, (2) reasonable deductions drawn from that evidence, (3) answers

54

to opposing counsel's argument, and (4) pleas for law enforcement. *Wesbrook*, 29 S.W.3d at 115. The trial court has broad discretion in controlling the scope of closing argument. *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.). The State is afforded wide latitude in its jury arguments and may draw all reasonable, fair, and legitimate inferences from the evidence. *Allridge v. State*, 762 S.W.2d 146, 156 (Tex. Crim. App. 1988).

Appellant first complains of the following comment made by the State during closing argument,

> And then you have Jeanette Russell's testimony. Probably the most honest, scary—scary, honest human being I've ever put on the witness stand. No holds barred—

Appellant objected to the statement as "improper opinion from the prosecutor as to the credibility of a witness." The trial court overruled appellant's objection, and the State continued, "No holds barred, she told you the whole story. And so, you have to decide which side you're going to lay with."

The State's argument was made in response to appellant's closing argument challenging Russell's credibility. For example, at one point, appellant argued that police officers "[got] together with Ms. Russell" to fabricate her testimony. And a substantial portion of appellant's closing argument was spent attacking Russell's credibility and suggesting that she conspired with the officers in devising her testimony. Because the State's argument was directed toward rebutting appellant's

55

assertion that Russell had fabricated her testimony in collusion with law enforcement, it constituted permissible jury argument. *See Wesbrook*, 29 S.W.3d at 115; *Kibble v. State*, 340 S.W.3d 14, 23 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

Appellant next complains that the State argued that he "wanted to keep [Davies] off that witness stand because it hurt [his] entire case." Appellant objected to the statement as "outside the record" and "improper argument," and the trial court overruled the objection. Again, the statement was made in response to appellant's argument referencing that the State had compelled Davies to testify. For example, at one point, appellant argued that Davies's testimony was truthful because she was compelled to testify under "the threat of prosecution for perjury." In addition, appellant testified that he did not want Davies to testify because she did not "deserve to get in any trouble" and the State was "threatening her with perjury." Thus, the State's comment was made in answer to appellant's argument that because the State had compelled Davies to testify, and she testified unfavorably to the State, she was being truthful.

We hold the trial court did not err in overruling appellant's objections to the complained-of closing arguments made by the State.

We overrule appellant's seventeenth and eighteenth issues.

**Jury Charge and Jury Instructions**

In his nineteenth issue, appellant argues that the trial court erred in not instructing the jury that it could not consider "evidence that was admitted for limited purposes as substantive evidence of guilt" because the trial court's instruction that the jury could consider the evidence "for no other purpose than impeachment" was inadequate. In his twentieth issue, appellant argues that the trial court erred in instructing the jury that a "defendant is presumed to have known the person assaulted was a public servant if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant" because the issue was not raised by the evidence. *See* TEX. PENAL CODE ANN. § 22.02(c) (Vernon 2011). In his twenty-first issue, appellant argues that the trial court erred in instructing the jury on the law of self-defense and defense of a third person because the evidence did not raise the issue of deadly force. *See* TEX. PENAL CODE ANN. § 9.01(3) (Vernon 2011). In his twenty-second issue, appellant argues that the trial court erred in not instructing the jury "on the voluntariness of Jessica Davies' written statement" because it was "a statement made by an accused." *See* TEX. CODE CRIM. PROC. art. 38.22.

### Standard of Review

Appellate review of error in a jury charge or instruction to the jury involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).

57

Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be some harm to the accused from the error. TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *Abdnor*, 871 S.W.2d at 732. In other words, properly preserved error will require reversal as long as the error is not harmless. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*

### Limiting Instructions

In his nineteenth issue, appellant complains of the trial court's limiting instructions pertaining to the admission into evidence of Davies's written statement, Russell's testimony regarding her conversation with Davies, and appellant's prior convictions. In each instance, the trial court instructed the jury that the evidence could be used to pass on the witnesses' credibility "but for no other purpose." Appellant requested that the trial court further instruct the jury that

"it may not consider the evidence as substantive evidence of guilt." The trial court declined to so further instruct the jury.

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." TEX. R. EVID. 105(a). Thus, when evidence is admitted for a limited purpose, the trial court must, upon request, provide such a limiting instruction. *Id.* The failure to provide the instruction may improperly result in the jury forming a negative inference about the defendant. *Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999).

Appellant relies on several cases in which courts have referenced an instruction to jurors not to consider limited-purpose evidence "as substantive evidence of guilt." *See Hernandez v. State*, 219 S.W.3d 6, 13 (Tex. App.—San Antonio 2006), *aff'd*, 273 S.W.3d 685 (Tex. Crim. App. 2008); *Ramirez v. State*, 987 S.W.2d 938, 946 (Tex. App.—Austin 1999, no pet.); *Owens v. State*, 916 S.W.2d 713, 718–19 (Tex. App.—Waco 1996, no pet.). However, although these cases refer to instructions given by trial courts to juries to not consider limited-purpose evidence as substantive evidence of guilt or suggest that trial counsel should have requested such instructions, none of the cases discuss a trial court's duty to so instruct a jury.

In *Walker v. State*, the Second Court of Appeals addressed the issue of whether the trial court erred in articulating its limiting instructions to the jury. 300 S.W.3d 836, 850–54 (Tex. App.—Fort Worth 2009, pet. ref'd). In its charge, the trial court instructed the jury that inconsistent prior statements used for impeachment "*may* be considered by you in determining, if it does so, the credibility and weight to be given the testimony of the witness . . . *and for no other reason.*" *Id.* at 850 (emphasis in original). The court concluded that the instruction was sufficient, holding that the trial court "was not required to further instruct the jury that it could not consider the impeachment testimony for purposes of determining guilt-innocence because that idea is implicit in the court's instruction that the impeachment testimony was to be used to determine credibility and '*for no other reason.*'" *Id.* at 851 (emphasis in original). In contrast, the court found error in the trial court's limiting instruction, made during trial, that impeachment testimony was allowed to determine the credibility of a witness but did not inform the jury that this was the testimony's "sole purpose" or that it could be considered "for no other reason." *Id.* at 851–52.

We agree with the Second Court of Appeals and conclude that a trial court is not required to further instruct a jury that it cannot consider limited-purpose evidence "as substantive evidence of guilt" where it instructs the jury to consider the evidence for its limited purpose "and for no other purpose." Accordingly, we

60

hold that the trial court did not err in not further instructing the jury in this case as requested by appellant.

We overrule appellant's nineteenth issue.

### *Presumption-of-Knowledge Instruction*

In his twentieth issue, appellant complains of the following instructions given by the trial court to the jury in the aggravated-assault-of-a-public-servant cases:

> The defendant is presumed to have known the person assaulted was a public servant if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant.
>
> You are further instructed that the facts giving rise to the presumption must be proven beyond a reasonable doubt; and that if such facts are proven beyond a reasonable doubt you may find the element of the offense sought to be presumed exists, but you are not bound to do so; and that even though you may find the existence of such element, the State must prove beyond a reasonable doubt each of the other elements of the offense charged; and if you have a reasonable doubt as to the existence of a fact or facts giving rise to the presumption, the presumption fails and you shall not consider the presumption for any purpose.

Appellant objected to the instruction, asserting that there was "no testimony that a distinctive police uniform was worn" during the execution of the search warrant, and the trial court overruled his objection.

The instruction mirrors the language used in the Texas Penal Code, which states the specific presumption of a defendant's knowledge that a person was a public servant if the person was wearing a "distinctive uniform or badge" and the

61

general instruction to be given for permissive presumptions. *See* TEX. PENAL CODE ANN. §§ 22.02(c), 2.05(a) (Vernon 2011). A permissive presumption allows, but does not require, the trier of fact to infer the elemental fact or ultimate fact from the predicate evidentiary fact or facts. *Willis v. State*, 790 S.W.2d 307, 310 (Tex. Crim. App. 1990). It places no burden on the accused to refute or disprove the elemental fact once the predicate facts have been established. *Id.* Since it does not relieve the State's burden of proving guilt beyond a reasonable doubt, a permissive presumption is generally deemed constitutional if, under the facts of the case, the reviewing court determines that a rational trier of fact could make the connection permitted by the presumption. *Id.*

Here, Lieutenant Gafford testified that Officers Rodriguez and Scoggins were wearing "ballistic vests" and "ballistic helmets" with the words "Houston Police" printed on the front and back of each item. The officers also wore a "tactical rig" that included straps for firearm holsters, handcuffs, and "additional magazines." Gafford explained that the items were obtained from "police supply stations" that deal "strictly [with] police" officers. He explained that whenever the officers made an arrest, their uniforms had "something on the outside to designate who they are." Rodriguez described their uniforms as a "standard uniform" that included "some kind of black T-shirt that says police." Furthermore, the trial court and the jury were presented with photographs showing Rodriguez's and Scoggins's

outfits worn at the time of the raid, and the officers put on the ballistic vests during trial to show their appearance to the jury.

In addition, other witnesses spoke to their ability to recognize the outfits in question as "distinctive" police uniforms. Russell testified that when she saw the officers approach appellant's apartment door, she immediately recognized them as police officers. And Officers Scoggins and Rodriguez both indicated that Davies, at the scene, quickly complied with their commands, which showed her recognition of the complainants as police officers.

Appellant did present some evidence that the complainants' firearms when used in a standing position could obscure the words "Houston Police" on the front of their vests, he was able to personally buy shirts with the words "Houston Police" written on them, and he was aware of burglars having impersonated police officers. However, given the descriptions of the officers' outfits, the civilian witnesses who testified to their recognition of the officers as police officers, and the photographs of the outfits in evidence, we conclude that the jury could have reasonably inferred that the officers' outfits were "distinctive uniforms" or appellant recognized them as police uniforms. Accordingly, we hold that the trial court did not err in instructing the jury on the presumption that appellant had knowledge that the complainants were public servants when they executed the search warrant of his apartment.

We overrule appellant's twentieth issue.

***Self-Defense and Defense-of-Third-Person Instructions***

In his twenty-first issue, appellant complains of the trial court's reference to "deadly force" in its instructions relating to the issues of self-defense and defense of a third person. He asserts that the "undisputed evidence established" that he "pointed a shotgun at the complainants and cycled it but did not fire." Alternatively, he asserts that the trial court erred in not instructing the jury on the use of non-deadly force in regard to self-defense or defense of a third person.

Deadly force is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *See* TEX. PENAL CODE ANN. § 9.01(3). Here, appellant admitted to pointing a loaded firearm at the complainants and "cycling" the firearm. Although appellant claims that his intention was to frighten the complainants because he believed that they were burglars, the manner of his use of the firearm was clearly capable of causing death or serious bodily injury. *See Smith v. State*, No. 04-95-00337-CR, 1997 WL 94151, at *1 (Tex. App.—San Antonio Mar. 5, 1997, pet. ref'd) (mem. op.) (not designated for publication) (stating that, under section 9.01(3), "brandishing a weapon and pointing it at a person constitutes deadly force"); *Paley v. State*, 811 S.W.2d 226, 229 (Tex.

64

App.—Houston [1st Dist.] 1991, pet. ref'd) (holding rational trial of fact could have found appellant used deadly force by pointing firearm at victim's car).

Appellant next asserts that the trial court erred in not providing the jury with a free-standing instruction "on the law of justifiable threats" pursuant to Texas Penal Code section 9.04, which states,

> The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

TEX. PENAL CODE ANN. § 9.04 (Vernon 2011). In *Smith*, the defendant requested a similar instruction where the jury had also been instructed on the laws of self-defense, apparent danger, and defense of third persons. 1997 WL 94151, at *1. The defendant argued that, unlike section 9.32, authorizing the use of deadly force in self-defense, section 9.04 does not "require the actor to retreat before threatening the use of deadly force." *Id.*; *see* TEX. PENAL CODE ANN. § 9.32 (Vernon 2011). The court noted that the first sentence of section 9.04 "incorporates the law of self-defense" as provided under sections 9.31 and 9.32, and the second sentence of section 9.04, thus, was not a "provision of a third variety or self-defense." *Smith*, 1997 WL 94141, at *1 (citing *Kirkpatrick v. State*, 633 S.W.2d 357 (Tex. App.—Fort Worth 1982, pet. ref'd)). The court concluded that the statute requires that "an actor can only point a gun at another person if a

reasonable person in the actor's situation would not have retreated, and if the other person used, threatened to use, or appeared to be about to use deadly force." *Id.* at *2. And the court held that a section 9.04 instruction would have been irrelevant given that the trial court provided instructions pursuant to section 9.31. *Id.*; *see also Cisneros v. State*, No. 08-09-00096-CR, 2010 WL 2990657, at *2–3 (Tex. App.—El Paso July 30, 2010, pet. ref'd) (not designated for publication) (relying on *Smith* to hold that defendant was not entitled to separate instruction under section 9.04). In addition, the court further noted that any error would be harmless given that the jury was properly instructed on self-defense and defense of others. *Id.*

We agree with the analysis presented in *Smith*. The first sentence of section 9.04 incorporates the justifications provided in Chapter 9 of the Texas Penal Code, including self-defense and defense of a third person. Because the jury was properly instructed on these issues, appellant was not entitled to a free-standing instruction under section 9.04 as well. Accordingly, we hold that the trial court did not err by in separately instructing the jury on "the law of justifiable threats."

We overrule appellant's twenty-first issue.

In his twenty-second issue, appellant asserts that the trial court erred in not instructing the jury "in the charge on the voluntariness of Jessica Davies' statement." In support of his assertion, appellant relies on article 38.22 of the

Texas Code of Criminal Procedure, which states that in "all cases where a question is raised as to the voluntariness of a statement of an accused, . . . evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose." TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6.

However, as explained above, article 38.22 expressly refers only to statements of the accused. A defendant does not have standing to challenge the admission of evidence obtained in alleged violation of another's legal rights. *See Janecka*, 739 S.W.2d at 829; *see also Neal*, 256 S.W.3d at 284 (holding that because defendant "lacks standing to raise either a constitutional challenge or a statutory challenge to the legality" of co-defendant's statement, he was not entitled to instruction regarding voluntariness of statement); *Pugh*, 2007 WL 686639, at *3–4 (holding defendant was not entitled to instruction on voluntariness of co-defendant's statement because even if statement was coerced, "the rights affected were those of [the co-defendant]," not defendant).

We overrule appellant's twenty-second issue.

## Prosecutorial Vindictiveness

In his twenty-third issue, appellant argues that the trial court erred in denying his motion "to set aside the cocaine indictment," appellate cause number

01-10-00543-CR, trial court cause number 1222277, because it was obtained "based on prosecutorial vindictiveness."

A claim of prosecutorial vindictiveness may be established by (1) proof of circumstances that pose a "realistic likelihood" of such misconduct sufficient to raise a "presumption of prosecutorial vindictiveness," which the State must rebut or face dismissal of the charges, or (2) proof of actual vindictiveness by presenting direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right. *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004).

In regard to the first situation, the Texas Court of Criminal Appeals has found a presumption of prosecutorial vindictiveness where the State pursues increased charges or an enhanced sentence after a defendant is convicted, exercises his legal right to appeal, and obtains a new trial. *Id.* In the very few situations in which this presumption does apply, it can be overcome by objective evidence in the record justifying the prosecutor's action that is unrelated to the defendant's exercise of his legal right to appeal. *Id.* at 173–74. The trial court decides the issue based upon all of the evidence and the credibility of the prosecutor's explanation. *Id.* In the second situation, when the presumption does not apply, a defendant may still obtain relief if he can show actual vindictiveness. *Id.* at 174. To establish such a claim, the defendant must prove, with objective evidence, that

68

the prosecutor's charging decision was made as a "direct and unjustifiable penalty" that resulted "solely from the defendant's exercise of a protected legal right." *Id.* Under this prong, the defendant shoulders the burden of both production and persuasion, unaided by any legal presumption. *Id.* Once again, the trial judge decides the ultimate factual issue based upon the evidence and credibility determinations. *Id.* at 174–75.

In its response to appellant's motion to set aside his indictment for the offense of possession of cocaine, the State asserted that, before the first trial, it had mistakenly dismissed the indictment instead of dismissing a defective indictment of appellant for the offense of possession with intent to deliver hydrocodone. The State noted that it had arraigned appellant in the cocaine case in the first trial, only to then realize that it had mistakenly dismissed the indictment. And it explained that it was always its intention "to proceed on all four indictments." In a pre-trial hearing on the State's motion to dismiss, the State noted that the trial court had indicated that it was "too late to move forward" on the cocaine indictment given the mistake. The State did not obtain the re-indictment of appellant in the cocaine case until after the trial court had granted appellant's first motion for new trial because "it was impossible . . . to go forward on the cocaine case unless [it] could re-indictment it and [appellant] would have waived his 10 days for jury trial." In its argument on appellant's motion to set aside the cocaine indictment, the State

69

asserted that had it "the opportunity to go forward" in the first case, it "certainly would have gone forward on all of the indictments." The trial court denied appellant's motion and expressly found that appellant did not raise a realistic likelihood of a presumption of prosecutorial vindictiveness.

We first note that the State obtained the re-indictment not after appellant exercised his "legal right to appeal," but after the trial court itself granted appellant's motion for new trial. *See id.* at 173. However, even assuming that appellant established a reasonable presumption of prosecutorial vindictiveness, the trial court was well within its discretion to believe the State's explanation that the first indictment was mistakenly dismissed and the State could not obtain a re-indictment in time to try all of the cases together. *See Hood v. State*, 185 S.W.3d 445, 448 (Tex. Crim. App. 2006) (holding that State had rebutted presumption of prosecutorial vindictiveness because trial court was entitled to believe assertion that State had mistakenly omitted enhancement paragraphs).

We next note that the record does not support appellant's claim of actual vindictiveness. The stated reason for obtaining the re-indictment, which the trial court was free to believe, was that the original indictment was mistakenly dismissed. *See id.* at 174. And appellant did not present any distinct evidence that the State sought the re-indictment based solely on his exercise of a protected legal

right.  Accordingly, we hold that the trial court did not err in denying appellant's motion to set aside his indictment for the offense of possession of cocaine.

We overrule appellant's twenty-third issue.

## Cumulative Error

In his twenty-fourth issue, appellant argues that the trial court's "cumulative errors denied [him] due process of law and a fair trial" because, even if none of the errors alone warranted reversal, the "combination of errors, when considered cumulatively, requires a new trial."

A number of errors may be found harmful in their cumulative effect. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988).  However, in the preceding twenty-three issues, we have only found error regarding voir dire and one evidentiary issue.[5]  We cannot conclude that the cumulative effect of these two errors constitutes cumulative harmful error that deprived appellant of his rights of due process of law and a fair trial.

We overrule appellant's twenty-fourth issue.

---

[5] In addition to his briefed issues, appellant asserts, in a footnote, that "the trial court sustained objections and instructed the jury to disregard inadmissible testimony and improper arguments but denied mistrials."  He argues that "when considered along with the points of error in the brief," the trial court's denial of mistrials "collectively demonstrate how the prosecutors repeatedly violated the law and disobeyed court orders to obtain unfair convictions."  As appellant has not fully briefed this issue and provides no citations of authority, we decline to address them in our analysis.  *See* TEX. R. APP. P. 38.1.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Justice Keyes, concurring without opinion.

Do not publish.   TEX. R. APP. P. 47.2(b).

72